JESSIE L. ANDREWS, Appellee, v. MARY S. ARMAGAST, Appellant.

DEEDS: Ratification of Voidable Deed.  An heir who would be a
1   beneficiary of property in case a deed were set aside because of a constructive fraud practiced on his ancestor, *may not question such deed* after the death of both said ancestor and his grantee:

(a) When it appears that said ancestor had, at all times after the deed was executed, and up to the time of her death (which was long after the death of the grantee), ratified and confirmed and acquiesced in said deed, and treated it as fair and just, and as on an adequate consideration, and

(b) When it also appears that said complaining heir had, from the time of the execution of said deed to a time long subsequent to the ancestor's death, *likewise* so ratified, confirmed. acquiesced in, and treated said deed.

WEAVER, J., dissents to the application made.

PRINCIPLE APPLIED:  A mother had one son and two daughters, and lived near Iowa City.  The family was poor, but the mother, about 1857, became the owner of 1,000 acres of un-productive land in Mills County, Iowa.  The son may have had some shadowy interest in this land at the time it was acquired. The son, in 1857, secured work in New York, and commenced to contribute to the support of the family, and so continued, with-out practical interruption, until his death, in 1900.  In 1889, the son was a widower, with two adult children.  He caused his mother and two sisters and a niece to come to New York, and the family was re-united.  From this time on, the son's contri-butions to the family took the form of supplying the members with all necessary wants.  The most trustful and loving rela-tions existed between all members of the family.  The son thenceforth looked after the said land for the mother, and she

relied on and implicitly trusted him. In 1896, the mother, being then 83 years of age, but bright and active, deeded the land to the son. Nothing was concealed from the sisters, and they approved of the deed. This deed simply recited, "Several valuable considerations," without specifying them. No agreement relative to past or future support was contained therein; but the mother and the son and the two sisters at all times acted as though some oral agreement did exist with reference thereto, and were manifestly satisfied therewith. The deed was probably prepared by the son and handed to the mother. She executed and acknowledged it in the son's absence. It is sufficient to say that the deed was executed under such circumstances that the law would stamp it as constructively fraudulent. The son died in 1900, and, just prior to his death, he deeded the land in question to his own daughter. No secrecy attended this conveyance, and the sisters and the mother approved thereof, though the mother seems to have had some forebodings as to what the son's daughter would do in the future, in the way of carrying out the son's obligations; but the mother, out of regard for the memory of her son, steadfastly refused, during the three remaining years of her life, to legally question the deed; *and the daughters fully agreed with the mother in the refusal to question said deed.* After the son's death, the new grantee continued the support of the family, just as her father had done, and in addition, discharged several substantial obligations in favor of the mother and sisters, which the parties seemed to regard as obligations which would have rested on the son, had he lived. The mother died in 1903. One of the daughters died in 1906. Almost 10 years after the mother died, the remaining sister, on the ground of fraud, brought action to set aside the deed from the mother to the son. Until shortly before bringing this action, this sister had steadfastly refused to legally question said deed. *Held,* she had irrevocably ratified and confirmed said deed.

JUDGMENT: New Issues Preventing Plea of Adjudication. A decree in a *successful* action instituted solely by one heir, to set aside a fraudulent conveyance, of which his ancestor was the victim, and to recover said heir's share in the property, is not available, as a conclusive adjudication, to another heir in a subsequent action to accomplish the same result as to himself, but met by *new* defenses not adjudicated in the first action; *nor is such former holding a necessarily controlling precedent.*

WEAVER, J., dissents as to the application made.

EVIDENCE: Ratification of Voidable Deed. In an action by an
3 heir to set aside a constructively fraudulent deed, which had
been obtained from a deceased ancestor, admissions of said
heir that she had, for many years, fully coincided with said
ancestor's determination not to legally question said deed, be-
cause of a mutual regard for the grantee, and admissions of said
heir, prior to her suit, that she herself did not desire any part
of said land, are competent on the issue as to whether said heir
had irrevocably ratified and acquiesced in said fraudulent deed.

FRAUD: Ratification of Fraudulent Deed. Ratification of a con-
4 structively fraudulent deed may be irrevocably binding, even
though the one who will take the benefit of the ratification has
in no wise changed his position by reason of the ratification.

*Appeal from Mills County District Court.*—E. B. WOOD-
RUFF, Judge.

OCTOBER 25, 1918.

SUIT in equity to set aside a certain deed of convey-
ance of land in Mills County, and to establish the title of
the plaintiff therein. There was a decree for the plain-
tiff, and the defendant has appealed.—*Reversed.*

*Genung & Genung, J. J. Sullivan,* and *Smyth, Smith
& Schall,* for appellant.

*John Y. Stone* and *C. E. Dean,* for appellee.

EVANS, J.—I. This case is closely related to the case
of *Curtis v. Armagast,* 158 Iowa 507. The plaintiff's at-
tack is upon the same conveyance as was successfully at-

tacked in the *Curtis* case. The record in-
1. DEEDS: ratifi- volves the same family history. The con-
cation of void-
able deed. veyance under attack was made by Mar-
garet Andrews to her son, James D. An-
drews, the brother of the plaintiff and the father of the
defendant. The evidence in the *Curtis* case was put in
evidence in the present case. The facts in the *Curtis* case,
including the history of the family, were gone into quite

fully in the majority and dissenting opinions filed therein, on appeal to this court. The conflicting opinions presented no material difference as to the detailed facts. We are disposed, therefore, to curtail somewhat the fact recitals herein, and to adopt by this reference the detailed recitals made in both the majority and dissenting opinions. The conveyance in question was made in 1896. It included all the land owned by the grantor, comprising about 1,000 acres, in Mills County, Iowa. The grantor, Margaret Andrews, was, at that time, 83 years of age. Her children and only heirs at law were the son James, and two daughters, Jessie Andrews and Margaret Gray. This conveyance was made in the state of New York, of which all the parties were residents. This conveyance by the mother was made with the full knowledge of the plaintiff, and with her apparent acquiescence. In the year 1900, James died. Shortly before his death, he conveyed the land to his daughter, Mary Armagast, the defendant herein. This conveyance also was made with the full knowledge of the mother, Margaret, and of the plaintiff, and with the apparent acquiescence of each. The mother, Margaret, died in 1903, without ever having repudiated the conveyance. The daughter Margaret Gray died in 1906, leaving surviving her her daughter, Belle Curtis, as her only heir. The conveyance in question was first challenged by Curtis by the bringing of her suit in attack thereon, in 1909. She obtained a decree in such suit, whereby her title to one third of the land was established, and such decree was affirmed here on appeal. Thereafter, and in the year 1913, the plaintiff instituted the present suit, whereby she seeks to establish her title also to one third of the land conveyed. Her petition rests upon the same allegations as did the petition of Curtis. The same defenses as were interposed in the *Curtis* case are interposed, also, herein, with a further defense that the plaintiff herself had ratified the con-

veyance in question and acquiesced therein, both at the
time thereof and again after the death of her mother.

The general ground of attack upon the conveyance is
that the grantee, James, sustained a fiduciary relation to
his mother, and that he obtained the conveyance in ques-
tion by virtue thereof, and without the free consent of the
grantor; and that the same was, therefore, obtained by
actual or constructive fraud. The answer set forth the
following defenses: (1) A general denial; (2) the stat-
ute of limitations; (3) ratification and acquiescence on
the part of Margaret Andrews; (4) ratification and ac-
quiescence on the part of plaintiff; (5) laches.

Upon trial had, decree was entered for the plaintiff,
and the defendant has appealed.

It is urged by appellee that the decree in the *Curtis*
case is an adjudication of every question involved here-
in, and that the same is available to the plaintiff; and
such decree has been accordingly pleaded
as an adjudication. Appellee cites no au-
thority in support of her contention at this
point. We think the contention is not
sound in principle. Jessie was not a party to the *Curtis*
case. She would not have been bound by an adverse re-
sult. If she had been a party, it would have been legally
and consistently possible to award recovery to Curtis and
to deny it to Jessie, or *vice versa*. Evidence introduced
might be competent as to one of the parties and incompe-
tent as to the other. The defense of the statute of limita-
tions might be sustained as to the one and denied as to
the other. Likewise, the plea of ratification and acquies-
cence. The question thus presented by the appellee is very
fully considered in *Allred v. Smith*, 135 N. C. 443 (65 L.
R. A. 924). The conclusions there announced are adverse
to the appellee's contention. A like conclusion was reached

2. JUDGMENT:
new issues pre-
venting plea of
adjudication.

by this court, and announced briefly, without argument, in *Sawyer v. Kelly*, 148 Iowa 644.

II.    It is further urged, however, that, even though the decree in the *Curtis* case be not an adjudication in a conclusive sense, it is, at least, a controlling precedent. The premise upon which this contention is based is that both cases rest upon the same propositions of law, and upon the same facts. If this premise be conceded, the conclusion would naturally follow. Though the two cases do rest largely upon the same legal propositions, this is not wholly true. It will be seen, also, in the further discussion, that the cases do not rest upon the same facts, even though they do rest largely upon the same evidence. This distinction arises, in part, from the fact that there is much evidence in the record which is competent as to one plaintiff and incompetent as to the other. Though this court was divided in opinion in the *Curtis* case, that difference will be deemed closed by the majority opinion therein, and will not be reopened now. Upon this record, the majority of the court reaches a conclusion adverse to the appellee, and such conclusion is based upon the differentiation found between the two cases. The general nature of such differentiation may be here indicated, in advance of the fuller discussion. In the *Curtis* case, Jessie Andrews was the principal witness, and was the only witness to the most important facts. The alleged dominance of the son James over the mother, and the fiduciary relation, were proved by her testimony alone. This consisted largely of personal transactions and communications between her and each of the deceased parties to the conveyance in question. Inasmuch as Jessie was not a party to that suit, or legally interested in the event thereof, this evidence was deemed admissible in the *Curtis* case. Under the inhibition of Section 4604 of the Code, such evidence is not admissible in this case, the witness being herself the plaintiff.

Furthermore, there appears in this record evidence of admissions made by this plaintiff, both by statement, by writing, and by conduct, tending to establish two fact propositions: (1) That, after the death of the son, James, the mother, Margaret, had ratified and acquiesced in the deed in question; (2) that the plaintiff herself, both before and after the death of her mother, had ratified and acquiesced in the same. This latter fact proposition was not in issue in the *Curtis* case. Though many, of the admissions were contained in the record in the *Curtis* case, as a part of the cross-examination of this plaintiff as a witness therein, they were not available to the defense as substantive evidence; whereas, they are available as such in this case. These admissions are admissible against the plaintiff, not only in proof of ratification and acquiescence, but in proof, also, that the conveyance itself was, in fact, a fair and just transaction. That the plaintiff herself had fully ratified and acquiesced in the conveyance in question after the death of her mother, and that such ratification and acquiescence were in accord with her previous attitude from the beginning, and that the conveyance had her full and free approval, as a fair transaction, continuously from the date thereof in 1896 until the beginning of the Curtis suit in the year 1909, is clearly established by the plaintiff's own admissions, as found in her own examination. Our discussion will, therefore, be confined to this issue, as being one not involved in the *Curtis* case.

III. Preliminary to a discussion of the evidence in this record, it is well to note just what was held in the *Curtis* case. It was held that actual fraud was not proven. The finding of constructive fraud was based upon the rule that the burden was upon the defendant to make affirmative proof, by evidence extrinsic to the deed, of the good faith of the grantee and the free and voluntary and intelligent action on the part of the grantor; and that the de-

fendant had failed to meet such burden. We quote briefly from the majority opinion:

"Decision of the merits of this controversy involves the consideration of two questions: First, was the deed to James D. Andrews obtained by actual fraud? And, second, if not obtained by express or actual fraud, was it obtained by constructive fraud? Or, stated otherwise, was it obtained under circumstances which cast upon the grantee and those claiming under him the burden of an affirmative showing of entire good faith on his part, and free, voluntary, and intelligent action on the part of the grantor?

"Were the appeal to be disposed of upon answer to the first inquiry, we should have no serious hesitation in reversing the decision of the trial court. The burden of showing actual fraud is upon the party pleading it, and in our judgment, plaintiff fails to make such a case. It is unnecessary for us to recite the evidence upon this issue. It is enough to say that no witness, speaking of his or her own knowledge, testifies to any misrepresentation, falsehood, or deceit on the part of the son to persuade or mislead his mother into a conveyance of her land, and the court should not and cannot enter into the realm of conjecture to fasten that stigma upon him.     *    *    *

"Under the rule upheld by these precedents, we think there is no room for doubt that the burden in the case before us is upon the defendants to affirmatively show that the deed under which they claim was obtained without undue influence, and was the free, voluntary, intelligent, and unrestrained act of the grantor.     *    *    *

"We have left, therefore, only to consider whether the evidence offered in support of the defense sufficiently sustains the burden of proof as to the validity of the deed. This, in our judgment, must be answered in the negative."

In 1857, the Andrews family consisted of the parents and the son, James D., and the daughters, Jessie and Mar-

garet. The father was a drunkard, and of no assistance to his family. He died in the early sixties. The son, James D., was born in 1837. Margaret was older, and Jessie was younger. Margaret was married, in 1850, to one Gray, but was later separated from her husband. She had one child, born in 1856, named Belle, who became Mrs. Curtis, and was the plaintiff in the *Curtis* case. She also was a member of the Andrews family. Prior to 1857, Margaret Andrews and her son, James D., had engaged in an enterprise of storekeeping at Solon, which lasted for a couple of years or more. The store was traded for the land in controversy, and other land. The land was cheap and unproductive; the family was poor. In 1857, James D. left home, and obtained employment. The financial relations between him and his mother and his sisters began at this point. The only living witness who has personal knowledge of these matters is the sister Jessie. Beginning in 1857, James D. sent, of his wages, to his mother and sister, from $150 to $200 every year, until he was married, in 1871. It is said by Jessie that his contributions ceased during his married life. But his married life was very brief, his wife dying in 1874, leaving him with two children, a son and a daughter. At this time, James D. was in the government service in New York City. After the death of his wife, he continued his benefactions, and visited his mother and sisters often. In 1889, he invited his mother and sisters to come to New York and make their home with him. Such arrangement was entered into. The family at Iowa City, at that time, consisted of the mother and two daughters and Mabel Stuart, daughter of Mrs. Curtis by her first marriage. James D. rented a residence near Sheepshead Bay, which was occupied by the family until it was broken up by death. It is urged in appellee's argument that this invitation was extended by James D. for his own advantage, and in order to obtain the help of his mother and sisters in tak-

ing care of his own children. The record warrants no such
assumption. His children were already quite grown up,
and were away at school.. The older, the daughter (now
Armagast, the defendant herein), had attained her ma-
jority. The son became engaged in business, and never
made his home there after such date. The service rendered
by the mother and daughters, which is somewhat pressed
in argument, was a service principally to themselves.

, After the Solon store was traded, the family made their
home in Iowa City, and there continued until their re-
moval to New York, in 1889. The circumstances relating
to the removal are recited by the plaintiff in her testimony
as follows:

"We removed to Brooklyn in November, 1889. He ad-
vanced the money to go there. Mabel Stuart went with
us. She was Mrs. Gray's granddaughter, and the daugh-
ter of Mrs. Curtis. She was a member of our family at
the time we removed to Brooklyn. Her mother was living
in Omaha part of the time, and part of the time in St. Paul.
Mrs. Curtis was unfortunate in her first marriage, and left
her husband. She had to go to work. She was a stenog-
rapher, and held a very good position, but left Mabel with
us. I wrote to my brother, before going to New York, and
asked him how it would be about Mabel coming. Mrs. Gray
thought perhaps there would be objection to it. He wrote
back that she was perfectly welcome to come with the rest
of us. I do not think mother would have gone to New York
without Mabel. Mabel was then eight years old, and had
lived in the family four years. My sister and I did most of
the work of the family. My brother's two children were
in school. Mabel was in school, and mother was not able
to do very much work. We never had any servant, except
a woman in to wash, two or three times, during that time.
His daughter did some sewing for herself, after she was
out of school. *  *  * He looked after us all as a father

would look after his children. He always seemed like a father to me. He always seemed to regard us with love."

The son had never been a man of wealth. He had been in the government service for many years, and was receiving a salary of $2,400.. The Mills County land had begun to pay a revenue in 1879, and James had indirectly managed it, through a resident agent. He had formerly had an interest in the title to this land. He had been interested, with his mother, in the operation of the Solon store, although at that time a minor. This land was received in exchange for the store. The title was originally taken in the name of James. Later, and while yet a minor, he conveyed it to his mother. She continued to hold the title thereto until October 8, 1896, when she conveyed the same to the son. The only living witness to the circumstances preceding this conveyance is the plaintiff. According to her testimony, the mother had in her possession a blank deed, partially filled. The mother told Jessie that she had received it from James. She consulted with Jessie about the proposed conveyance. Her name had not been written into the deed as grantor. She signed the deed at her home, in the presence of Jessie alone, and wrote into the body of the deed her own name as grantor. Some days later, she went before a notary public in the city, and acknowledged the same. The deed purported to be for "several valuable considerations." The relations of the members of the family continued as before, James bearing the full expense of the family, and contributing to their every need. Two years after the execution of the deed, James became ill. His illness soon became a complete paralysis, whereby he himself became utterly helpless and dependent. His condition is concisely described in the brief of counsel for appellee as follows:

"About two years afterward, James D. was stricken with paralysis. Within a few months, he became wholly helpless physically. He could not move a muscle, except those of

the eyelids, and possibly, to a slight extent, some of the muscles of his neck. He could only talk with his eyes. His daughter Mary, the defendant, was his interpreter. She learned to know when he wanted to say something, and then began to recite the alphabet, and when she pronounced the first letter of the first word he wished to speak, he would wink; and she would repeat the alphabet down to the second letter, when he would wink as before. In this manner, she got the first word complete, and in the same manner, the second word, and so on until he had finished what he wished to say. His hearing was good, and his mind apparently clear. Mary was with him almost constantly, day and night."

Shortly before he died, he conveyed the land to his daughter, the defendant herein. It is without dispute that this was done with the knowledge and approval of the mother, Margaret, and of the sister, Jessie. About the time of the beginning of his illness, James gave to his mother a note for $1,200, in settlement of a balance due her. Including this note, the mother had separate assets amounting to $4,000. Before the death of James, these assets had been turned over by the mother to Jessie. For 40 years, James had carried a policy of insurance for $10,000, in favor of his mother. This was kept in force until his death. On the evening of the day of his funeral, this was transferred by the mother to Jessie. After the death of James, his daughter Mary, defendant herein, assumed the burden of the family expenditures, which had been borne by her father up to the time of his death, and so continued to do until the death of Margaret Gray, in 1906, the mother, Margaret, having died in 1903. The $1,200 note owed by James at the time of his death, and held by Jessie, was paid by Mary. The amount due on the $10,000 policy proved to be somewhat less than $10,000, and the difference was paid by Mary to Jessie. These payments by Mary were done

pursuant to the mutual understanding of the parties that she had stepped into her father's place, by the conveyance from her father, and was under duty to perform his obligations. The foregoing is, perhaps, a sufficient statement to disclose the significance of a few quotations from the record, as bearing upon the question of ratification and acquiescence. Jessie testified:

"He [James F Andrews] paid the grocery bills; and whatever necessary wearing apparel Mrs. Gray and myself needed was provided by James D. Andrews. That was also true of Mrs. Gray's granddaughter. Mrs. Gray's health was poor, and she required more or less medical treatment, and that was provided by James D. Andrews. There never was a thing that was within his power to do for any of us that James D. did not do; and as a result of this, my mother thought the world and all of James D. Andrews. * * * Until the time of his death, James D. Andrews always thought a great deal of his mother, and she thought the world and all of him. My brother also thought a great deal of Mrs. Gray and myself. As a matter of fact, my brother, James D. Andrews, was a man of great industry, kind-hearted, good habits, and an upright Christian man. Of all the people I have ever known, it is my judgment and the judgment of all the members of the family, he was as high-minded and as charitable and as kind and as much of a Christian man as I have ever known. He was never accused of a dishonorable act in his lifetime. * * * Q. To whom did she go for advice and consultation in regard to any matters in which she was interested, during the time she was in New York? A. My brother, and she talked things over with me, always. Q. What were the relations between her and your brother? A. The very best, always. * * * Q. Did you have any talk with your mother about the deed, from the time it was acknowledged in New York until her death? A. Yes, sir. Q. What was

it?    A. Well, during my brother's life, she always spoke
with reference that he would do what was right.   I know
the time when my brother deeded the land in question to
Mary, now Mary Armagast.   I knew of the conveyance.   Q.
After your brother's death, did you have any talk with
your mother about the land?    A. Yes, sir; she talked about
it.    Q. What did she say?    A. She thought things were
always going the same as they had when my brother was
alive; the house would be kept, and everything would go
on the same.   She thought that was understood.   After
my brother's death, my mother and myself discussed the
matter of Mary owning and holding all the Iowa land.
She never commenced a suit, but often discussed that mat-
ter.   She did not commence a suit because she did not want
to cast any reflections on my brother; and she said, in sub-
stance, that she would not commence a suit to set aside
this deed, because it would reflect on James.   I often heard
her say that, and she said that, because he did not hand her
that dollar, she *could* get the land back.   But at those times
she said that, she said she would not bring a suit, because
she did not want to reflect on James.   The fact is that my
mother was never willing to commence or have commenced
a suit to set aside that deed, and that was true up to the
time of her death.   She preferred to let it go as it was,
rather than to have any suit,—rather than to bring any
suit to set it aside.   Q. She knew that Mary was claiming it
all the time?    A. Yes.    Q. But with that knowledge, she
never in her lifetime was willing to commence a suit or au-
thorize any lawyer to commence a suit to set it aside?    A.
No.    Q. And never changed from that opinion up to the time
of her death?    A. No.    *    *    *    Q. Why didn't you sue
her after your mother's death?    A. Well, I had the same
feeling mother had.   I did not want to cast reflection on my
brother."    She testified, also: "I tried to prevent Mrs
Curtis from bringing that suit."

In August, 1907, the plaintiff had correspondence with Christy, the agent of the defendant, Mary Armagast. She wrote therein as follows:

"When mother deeded the land to my brother, she was not obliged to do so by law, but from a sense of justice for what he had done for her. He had promised many things. My sister and I were to have a home, and enough to keep us. We had nothing in writing, and I do not think he dreamed but what we would be all right. As far as I am concerned, I want nothing; but my sister left a daughter, who has to be kept. You can give this to Mary, as I have been intending to write to her."

Being confronted with the above letter, the plaintiff testified, on cross-examination, as follows:

"Q. But you had made up your mind, so far as you were concerned, you wanted nothing out of it? A. That is the way I felt then. Q. In this letter, you said, did you, in referring to Mary, 'You can give this to Mary, as I had been intending to write to her?' A. Yes. Q. And you meant just what you said there? A. Yes, at that time. Q. Everything you have said in that letter that I have called attention to, you meant just what you said, didn't you? A. Yes, I felt that way. Q. That is the way you felt when you wrote Mr. Christy? A. That is the way I expressed myself then. Q. Was that expression true? A. Yes, I tried to feel that way. Q. You meant just what you said in that letter? A. I did. Q. Each and every part of it? A. I did. Q. That was the condition of your mind at that time, wasn't it? A. I sat down and wrote that letter after he had written me about the deed. I was angry at that time at Mrs. Curtis for starting the suit. Q. But speaking for yourself at that time, the condition of your mind was such that you said, 'As far as I am concerned, I want nothing?' A. Yes. Q. That was the frame of your mind at that time? A. Yes. Q. Well, there is not a fact in connection with any of these

conveyances, or in connection with conditions between James D. and his mother that you know now that you did not know then, is there? A. No. Q. But you have changed your mind, have you? A. Changed my mind. A woman is privileged to do that." She also testified: "When my brother died, my mother had his note for $1,200 and Mary paid that. Q. Why did she pay that? Because she had the Iowa land? A. She was obliged to pay it. It was her father's debt; she had everything he had. Q. Was that the reason she paid it? A. I suppose so. Q. Then the fact is, and it was understood among all of you, that, because Mary had this Iowa land, she paid that $1,200? Now that is the fact, is it? A. Yes, that was her income."

The Christy letter, from which quotation is above made, contains other significant statements. Christy was acting as an abstracter, or as an examiner of title for the defendant. He appears to have found record defects in her title, and to have written to the plaintiff, Jessie, for information concerning the title. She wrote, in reply:

"Your letter of July 23d received. In the early '50's, mother gave my brother, Jas. D. Andrews, money to open a store in Solon, a small place about 12 miles from Iowa City. He sold out to a Mr. Pratt, and took the Mills County land as part payment, and deeded it to mother for the money she had loaned him. He was very careless in business matters; and, as the 200 acres was a separate piece, there were two deeds, and in some way the deed was lost, and never recorded, and neither he or mother knew it, until Mr. Kerr tried to seize it for a note he had against my brother. Mother won the suit; but Mr. Boal, one of the lawyers, advised my brother to settle with Mr. Kerr, which he did for $500. I do not remember exactly about this, but suppose mother raised the money by mortgage to settle for him."

The foregoing indicates her mental attitude with ref-

erence to the title and its history. It recognizes that, at the time of the conveyance under attack, James D. had a stale equity in the title, which was justly recognized by the mother. It was an assertion of the integrity of the defendant's title. It indicated an active mental justification of the title, which attitude she maintained down to the time of her expostulation with Mrs. Curtis, in 1909. Whether the statements contained in this letter could be deemed proof, as against the plaintiff, of the original validity of the conveyance under attack, we do not stop to consider.

It is sought to avoid the force of these admissions by the plaintiff by the suggestion that she was unsophisticated and ignorant. The argument is not justified by the record. On the contrary, it appears that she is an intelligent and educated woman. For many years, she and her mother conducted successfully a modest business. She testified that she was her mother's secretary, and conducted all her correspondence, and was consulted by her mother in all her transactions. It further appears from the record that, in 1899, during the illness of James, he executed a bill of sale to his daughter, Mary, of all the crops and personal property upon the Mills County farm. This bill of sale was prepared by Jessie, in her own handwriting. The mother also was a bright woman of fair business capacity. In early life, she had been a postmistress, and had engaged in some kind of business throughout her mature life, up to the year 1889. Though she was 83 years of age at the time of the conveyance in question, she lived 7 years thereafter, and continued to maintain all her mental faculties, to an unusual degree, to the last day of her life. The O'Briens, husband and wife, testified, as witnesses for the plaintiff, concerning their acquaintance with the mother, during the last three months of her life, during which time they lived in the same house with her. Mrs. O'Brien testified:

"She was then a very bright old lady, possessed of all her faculties, had a clear idea of what was going on, had a very clear recollection, and I would say that she was in full possession of all her mental faculties. As a matter of fact, she was an exceptionally keen and bright old lady during all the time I knew her."

Mr. O'Brien testified:

"I am quite sure she was the brightest old lady I ever knew. She was healthy in body and mind. I am quite sure about that."

It appears of record, also, that Mrs. Andrews died a sudden death, after an illness of only a few hours. There is no room, upon this record, to minimize the intelligence of either the plaintiff or her mother. In line with the admissions above quoted from the testimony of Jessie, oral statements made by her of the same general character were testified to by witnesses. We shall not dwell upon these. The substance of her admissions is that she had full knowledge of all the circumstances pertaining to the conveyance; that, with such knowledge, for 13 years she believed the conveyance to be just and fair; that she was angry at Mrs. Curtis when she first challenged the same; that the conveyance was intended, to some extent, as a distribution of property; that it also had a substantial consideration in the oral undertakings of James; that these oral undertakings were performed by him during his lifetime, and by his daughter after his death; that such performance operated to the benefit of this plaintiff, and that she accepted such benefits intelligently and freely for several years; that, when she changed her mind, and determined to challenge the conveyance, her change of mind was not based upon any new discovery of facts. Much might be said in support of the contention that her admissions are sufficient evidence, as against her, to rebut the presumption of fraud, and that they should be deemed sat-

3. EVIDENCE: ratification of voidable deed.

isfactory affirmative evidence that the transaction between mother and son was, in fact, free from fraud, and was assented to by the mother freely and intelligently; but we need not deal with that question. What we do hold is that these admissions of the plaintiff, in the light of the other circumstances of the case, constitute most satisfactory evidence, not only of her original approval of the transaction at the time thereof, and thereafter during the life of her brother, but also of her ratification and acquiescence therein, freely and intelligently, for many years after the death of her mother.

It is urged that the long delay of the plaintiff in challenging the conveyance worked no prejudice to the defendant, in that she had never changed her position by reason thereof. The premise is not sustained by the record; and if it were, the conclusion thus drawn does not properly follow. When the defendant continued the family support at her own expense, in purported pursuance of her father's obligation, she changed her position. When she paid the $1,200 note to Jessie, she changed her position. When she made up the deficiency of the insurance policy, she changed her position.

4. FRAUD: ratification of fraudulent deed.

But it was not legally necessary that she should have changed her position. Ratification and acquiescence may be found, even though elements of estoppel are wanting. The conveyance, even if fraudulent, was valid on its face. It would continue valid until the injured party elected to repudiate it. The right of election to repudiate carried with it the right to waive the fraud, and to ratify the transaction. In this case, the alleged constructive fraud was predicated upon the absence of the free consent of the grantor at the time of the conveyance. Though evidence of the free consent of the grantor at the time of the conveyance be wanting, and though free consent be, therefore,

deemed wanting at the time of the conveyance, yet it was competent for the grantor to give such free consent at any time thereafter, and thereby to render the deed irrevocably valid. Such subsequent consent is ratification and acquiescence. It relates back to the original transaction, and has no need of a new consideration.

A few quotations from the authorities will sufficiently indicate the state of the law on the subject of ratification and acquiescence. In *Hayward v. National Bank*, 96 U. S. 611, it was said:

"The facts present insuperable obstacles to any decree in favor of the appellant. If the sale made by the bank was originally impeachable by him [Hayward], the right to question its validity was lost by acquiescence on his part. He was in a condition, immediately after the sale, to enforce such rights as the law gave him, as he was fully apprised of their nature, and of all the material facts of the case. He now claims that the sale was in derogation of his rights and injurious to his interests; and yet his conduct was uniformly inconsistent with any purpose to repudiate the sale or assert ownership of the stock. His course was continuously such as to induce a reasonable belief of his fixed determination to abide by the action of the bank. He remained silent when he should have spoken. He will not be heard now, when he should be silent. He must be held to have waived and abandoned the right, if any he had, to impeach the transaction of September 8, 1868."

In *Naddo v. Bardon*, 2 C. C. A. 335 (Justice Brewer) is the following:

"Undoubtedly, the doctrine is established that a trustee cannot purchase or deal in the trust property for his own benefit or on his own behalf, directly or indirectly. But such a purchase is not absolutely void. It is only voidable; and, as it may be confirmed by the parties interested directly, so it may be by long acquiescence or the

absence of an election to void the conveyance within a reasonable time after the facts come to the knowledge of the *cestui que trust.*"

*Jenkins v. Pye,* 12 Peters (U. S.) 241:

"A lapse of time and the death of the parties to the deed have always been considered in a court of chancery, entitled to great weight, and almost controlling circumstances in cases of this kind."

Pomeroy on Equity Jurisprudence, Section 965:

"*Mere* delay, mere suffering time to elapse without doing anything, is not acquiescence, although it may be, and it often is, strong evidence of an acquiescence; and it may be, and often is, a distinct ground for refusing equitable relief, either affirmative or defensive. As acquiescence is thus a recognition of and consent to the contract or other transaction as existing, the requisites to its being effective as a bar are, knowledge or notice of the transaction itself, knowledge of the party's own rights, absence of all undue influence or restraint, and consequent freedom of action; a conscious intention to ratify the transaction, however, is not an essential element."

*Lowndes v. Wicks,* 69 Conn. 15:

"It [acquiescence] has been well defined as quiescence under such circumstances that assent may be reasonably inferred from it. * * * Assent thus given is as irrevocable as if expressly stated in words."

*Cobb v. Simon,* 119 Wis. 597 (97 N. W. 276):

" 'To ratify' means to confirm or approve of, and such ratification may be signified by acts of omission as well as of commission—negatively as well as affirmatively."

*Somers v. Germania Nat. Bank,* 152 Wis. 210 (138 N. W. 713):

"The intent to waive may appear as a legal result of conduct. The actuating motive or the intention to abandon a right is generally a matter of inference, to be deduced

with more or less certainty from the external and visible acts of the party, and all the accompanying circumstances of the transaction, regardless of whether there was an actual or expressed intent to waive, or even if there was an actual or undisclosed intention to the contrary."

The admissions of the plaintiff which are here considered as tending to show ratification are strongly corroborated by the undisputed circumstances of the case. The land, when acquired, was of small value, and represented the Solon store investment of $1,000. For 22 years, the land produced no revenue. During that period of time, the contributions of James to his mother and sisters amounted, admittedly, to several thousand dollars. Without these contributions, the land could not have been held. The ties of affection between mother and son were admittedly very strong. It is not difficult to believe that, in the disposition of her estate, she should want her son to have the land. Nor is it difficult to believe that she did freely trust him to the performance of even his oral promise to support the family. Her trust was never disappointed; not even after the death of her son. Be that as it may, she affirmatively refused to challenge the deed in her lifetime; and Jessie, by her own admission, "felt the same way." We reach the conclusion that the plaintiff, by conduct, by writing, and by speech, freely and intelligently ratified the conveyance which is now assailed. The decree below will, therefore, be—*Reversed.*

PRESTON, C. J., LADD, GAYNOR, SALINGER, and STEVENS, JJ., concur.

WEAVER, J. (dissenting). As stated in the majority opinion, the evidence in the *Curtis* case was introduced and used by the parties on the trial of this case. In that case, Mrs. Curtis claimed a one-third interest in a tract of land, as against Mrs. Armagast. In this case, plaintiff claims an·

other one third of the same land, against Mrs. Armagast. The plaintiff in each case claimed a share in the land as an heir of Margaret Andrews, deceased, the one being her daughter, and the other, the only child of a deceased daughter. The heirship of neither was questioned or denied; and, if entitled to inherit at all, each was entitled to a one-third part of the same property. Both traced their claims of title to the same source, were met by the same defense, and the issues were tried on the same evidence. In the former case, we sustained the claim of the heir, but in this we deny it,—a situation quite suggestive of a famous alleged precedent where counsel, defending his client's claim of title to a tract of land, relied upon a decision by the same court in an altogether parallel controversy, but was overruled because, as the court said, "this is another 40 acres." The only pretense of any difference between the lines of attack and defense in the two cases is made to hang on a claim of so-called "acquiescence" by the plaintiff in the conveyance from her mother to her brother, the father of defendant, and the conveyance by him to his daughter; and this, as I shall try to demonstrate, is a distinction or difference without real foundation in the record. Every essential fact in this case was treated and considered in the *Curtis* case, and its legal force and effect settled and determined. That case was tried below and argued here with unusual thoroughness; it was held in this court for a very considerable period for careful consideration; it was again argued and again considered by the entire court on a petition for rehearing; and relying thereon, I should content myself with a simple registering of my dissent, without discussing the merits of the litigation, if the majority had adhered to the purpose, expressed in the preface of their opinion, to consider the difference of views arising in that case closed by the decision there rendered. So far from doing so, however, the opinion, as written, reviews the

family history anew, from the standpoint of the dissent in
the *Curtis* case, and dwells with much detail upon the
alleged extraordinary fidelity and devotion of James to
his mother and sisters, and conveys the impression that
his life was one continual round of sacrifice in their be-
half, and that the conveyance to him of 1,000 acres of valu-
able land was but a natural and well earned return for his
filial services.    Such was the view very forcibly expressed
in that dissent; and when it is brought forward into this
case, and used to express the voice of the present majori-
ty, it has the savor of a confession and apology to the de-
fendant, and to the shade of her departed ancestor.    For
one, I do not desire to assume that attitude.    There was
and is no occasion for a judicially constructed halo for
James.    That he was a kind and affectionate son and broth-
er, I grant, and that he entertained any conscious intent
to defraud these women, I do not for a moment believe;
but the suggestion that his contributions to their support
were "benefactions," pure and simple, for which the moth-
er became under any moral obligation to impoverish her-
self, to endow him or his children with riches, is without
a single substantial foundation in the record.    The fact
that the title to the land was first conveyed to James, some
60 years ago, and by him conveyed to his mother, is a cir-
cumstance on which it is sought to hang an inference that
he once had, and perhaps always had, an equity of some
kind in the property, in recognition of which the convey-
ance by his mother in her old age was made.    There is
nothing to show that he ever had a dollar's interest in the
land, until this last conveyance was made.    On the con-
trary, it affirmatively appears that, one of his creditors
having sought to take advantage of his nominal title to
the land, and subject it to the payment of his debt, he
showed, to the satisfaction of the court, that he had taken
the title solely in trust for his mother.    Moreover, at the very

time he was continuing his so-called benefactions to these members of his family, he received and enjoyed the use, rents, and profits of all the land; and it is reasonably clear that, had the son and mother sought to exact mutual accountings, the balance of credit would not have been found in favor of the former.

But I do not care to continue the subject any further, and now come to the so-called acquiescence, upon strength of which this plaintiff is to be deprived of the right to inherit one third of 1,000 acres of land, in favor of her brother's daughter, who has already admittedly received, in her own right, another one third thereof. The claim thus sustained finds three different expressions in the opinion. In the first place, speaking of the deed made by the aged mother to her son, it is said that the deed was made "with the full knowledge of the plaintiff, and with her apparent acquiescence." Again, referring to the deed from James, while on his deathbed, to his daughter, it is said that this conveyance was made "with the knowledge of the mother, Margaret (mother of Mrs. Curtis), and of the plaintiff, and with the apparent acquiescence of each;" and finally, it is repeated that, when this suit was begun, "plaintiff had fully ratified and acquiesced in the conveyance, after the death of her mother, and that the same was in accord with her previous attitude from the beginning, and the conveyance had her full and free approval, as a fair transaction, continuously from the date thereof in 1896 until the beginning of the Curtis suit, in 1909."

Now, an acquiescence which will serve to defeat the assertion of a property right by a person to whom it would otherwise belong, exists only where the person so barred or estopped has a right to object to the act or thing in which he is alleged to have acquiesced. The land was owned by plaintiff's mother, and neither plaintiff nor Mrs. Gray (mother of Mrs. Curtis) had or could have had any interest

in the property until the mother's death, in 1903, when, as
her heirs, they each succeeded to a one-third interest in her
property and property rights.   Until the mother's death,
she could sell or dispose of her property as she pleased;
and, if her daughters respected that right, and offered no
objection to its exercise, there is, I insist, neither principle
nor precedent for holding them to have thereby lost their
rights which vested in them as heirs, long after the convey-
ance which we decided to be voidable because of the con-
structive fraud of James.   Now, what is an acquiescence,
in the legal sense of the word, as here employed?   The an-
swer is well put in a leading English case, as follows:

"If a person *having a right,* and seeing another person
about to commit or in the course of committing an act
*infringing on that right,* stands by in such manner as really
to induce the person committing the act, and who might
otherwise have abstained from it, to believe that he assents
to its being committed, he cannot afterwards be heard to
complain of the act."   *De Bussche v. Alt,* 8 Ch. D. 286, 314
(2 E. R. C. 289).

This, it is said in *Leeds v. Amherst,* 2 Phillips 117 (2
Eng. Ch. 886), is the proper sense of the term "acquies-
cence."   Such, also, is the effect given to the rule by the
courts of this country.   It is said to be in the nature of an
estoppel.

"It is a release or abandonment of one's *rights;* if,
*having rights,* he stands by and sees another dealing with
his property in a manner inconsistent with such *rights,* and
makes no objection while the act is in progress."   *Board v.
Plotner,* 149 Ind. 116.

"It exists where a person knows he is *entitled to im-
peach* a transaction or enforce a *right,* neglects to do so
for such length of time that, under the circumstances of
the case, the other party may fairly infer that he has

waived or abandoned his right." *Connell v. Clifford,* 39 Colo. 121 (88 Pac. 850).

"It is only when silence or acquiescence becomes the basis or authority on which another parts with something valuable or incurs a liability that the doctrine applies." *Austin v. Jones,* 148 Ala. 659.

See also *Scott v. Jackson,* 89 Cal. 258; *Norfolk & W. R. Co. v. Perdue,* 40 W. Va. 442; *Rinake v. Victor Mfg. Co.,* 58 S. C. 360; *Hall v. Otterson,* 52 N. J. Eq. 522, 532; 1 Am. & Eng. Encyc. Law (2d Ed.) 570; *Woodruff v. North Bloomington G. M. Co.,* 18 Fed. 753, 790.

In other words, if a person has no right to object to the act of another at the time it is done, then, clearly, he cannot be held barred or estopped by acquiescence when he attempts to enforce a subsequently acquired right; nor will such bar or estoppel arise in any court, unless the party asking its protection has, in reliance upon his silence, materially changed his position, or incurred expense or liability with which he would not otherwise be chargeable. See cases already cited.

Now in the present case, as I have before said, when James procured the conveyance from his mother, neither the plaintiff nor Mrs. Gray had any interest whatever in the land. So, also, when he conveyed to his daughter, the mother was still living, and neither plaintiff nor Mrs. Gray had acquired any right to object; and their failure to object was, clearly, no acquiescence. Passing from this to the other argument indulged in by the majority: that, while Mrs. Andrews was a competent witness in the *Curtis* case, she is not such in her own, and therefore there is a material difference in the competent showing in support of her own claims. But her incompetency, if any, extended no further than to the personal transactions between herself and her mother, and an examination of the record shows that scarcely the smallest fraction of her evidence of that character

has any material bearing in support of her claim in this suit. It furthermore appears that, on the trial of the *Curtis* case, defendant did object to the testimony of Mrs. Andrews concerning the circumstances of the conveyance to James, because of her like interest with Mrs. Curtis; and, on repetition of that objection in this court, we expressly held that, eliminating her testimony from the record, we still were forced to the same conclusion that the burden was upon the defendant to affirmatively establish the good faith of the transaction, and that this had not been done. It is too evident for serious argument that, in all essential respects, there is absolutely no difference in the cases; and yet, while saying that the controversy, so far as it relates to the constructive fraud of James, which was held to vitiate the deed, was closed by the decision in the first case, we impliedly undermine its authority and deny its conclusions, by saying that there is much to be said in favor of the conclusion that the transaction between mother and son "was, in fact, free from fraud, and assented to by the mother freely and intelligently." If a case once "closed" by final decision is still to be regarded as sufficiently open to have its vitals extracted and its value as a precedent destroyed by raising a doubt as to the sufficiency of the evidence on which it was based, then the sooner we abandon the publication of our reports, the better. Not that a case once decided becomes an immutable precedent, or immune to criticism; but it is to the interest both of the public and of the legal profession that a decision once made shall stand until the time comes when the court is ready to announce a change of view; and then it should be squarely overruled.

In closing, I wish to add, without reference merely to its effect upon this case, that the effect given by the majority to Code Section 4604 goes beyond any of the numerous holdings which this court has announced upon the com-

petency of witnesses. The constructive fraud which was held sufficient to set aside the deed from the mother to James was based upon the relations existing between them, and them alone; and the transaction found to be fraudu- lent was a transaction between them only. The plaintiff was in no wise incompetent to testify as to these things, in either the *Curtis* case or in this case. She could not, of course, over the defendant's objection, testify to the com- munications between herself and her mother; but this part of her story is very fragmentary and inconsequential, and its exclusion does not affect the sufficiency of the evi- dence as a whole. The opinion says, however, that:

"In the *Curtis* case, Jessie Andrews was the principal witness, and was the only witness to the most important facts. The alleged dominance of the son, James, over the mother, and the fiduciary relation, were proved by her tes- timony alone. This consisted largely of personal transac- tions and communications between her and each of the de- ceased parties to the conveyance in question. * *. * Un- der the inhibition of Section 4604, such evidence is not ad- missible in this case."

Surely, this is too broadly stated, and is a ruling to which I am sure we shall not long adhere. I take issue both with the statement of the record and of the law ap- plicable thereto.

Finally, it may fairly be said that the opinion, though expressed with all the persuasiveness and force which are characteristic of its writer, is singularly unconvincing to anyone who takes the trouble to test the accuracy of its statements and soundness of its conclusions by a careful examination of the entire case. When all is said, it is an attempt to distinguish the undistinguishable, and to es- cape the inescapable, and to prove that two absolutely parallel lines will diverge, if they are only sufficiently pro- longed. To the paucity of the material which the record

affords, and not at all to any lack of skill in their handling, is the failure to accomplish that triumph in the field of law and logic to be attributed.

Under our former holding, the trial court could not have done otherwise than it did in this case; and in my judgment, it would have been subject to just censure, had it ignored the precedent we established for it. The decree ought to be affirmed.